THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. JAMES SLY.

SPECIAL FINDINGS *Sustain Verdict; No Cause for Reversal.* Where the special findings of fact of the jury are not contested, and where such findings show conclusively that the alleged errors as to evidence and instructions could not and did not prejudice the defendant, no cause for a reversal of the judgment rendered upon the special findings, which sustain the verdict, is presented.

*Error from Pawnee District Court.*

ON July 22, 1882, *James Sly* commenced his action against the *Atchison, Topeka & Santa Fé Railroad Company*, in the district court of Reno county, to recover $10,000 for alleged personal injuries. The railroad company filed its answer containing a general denial, and also alleging that the plaintiff was guilty of gross negligence, and that he directly contributed to his injuries. Sly filed a general reply. Subsequently the case was sent to Pawnee county for trial, and tried in that court before a jury, at the January term, 1887. The jury returned a verdict in favor of Sly, and assessed his damages at $2,900. The jury also returned the following special findings upon questions submitted by Sly:

"1. Was Mr. Kendall the boss or head man in building the ice-house at Nickerson, in December, 1881 ? *Ans.:* Yes.

"2. Did said Kendall superintend said job, hire and discharge the men, and keep their time, and pay these men employed on said job by the orders of the Atchison, Topeka & Santa Fé Railroad Company? A. Yes.

"3. Did the accident to plaintiff occur from the act of said Mr. Kendall in calling N. Dixon away from his work before he had made the scaffolding in said ice-house secure, and was said accident caused by the orders of said Kendall in so calling said Dixon away, and the failure thereafter to have the said scaffolding made secure? A. Yes.

"4. Was said N. Dixon employed by said Kendall? A. Yes.

"5. Was it not the duty of said Dixon to obey the orders of said Kendall, and do such work as was assigned to him? A. Yes.

"6. Was not said accident caused by the failure of said Dixon to secure the scaffolding in said ice-house? A. Yes.

"7. If you answer the above questions in the affirmative, please state whether said Dixon was called away from his work by Mr. Kendall before he had made the same secure. A. Yes, he was.

"8. If you answer No. 7 in the affirmative, was not the obedience of said Dixon to said Kendall the reason why said scaffolding was left insecure? A. Yes.

"9. Had said Sly any knowledge at the time he went to work on said platform that the same was insecure? A. No."

The jury also returned the following answers to questions submitted by the railroad company:

"1. When and by whom was the plaintiff, James Sly, employed? *Ans.:* Kendall, foreman for the said railroad company, on or about December 6th to 8th, 1881.

"2. Is it not a fact that he was employed as a carpenter to assist in the building of the ice-house? A. Yes.

"3. Was not the scaffolding around the ice-house put up for the purpose of assisting the men in building the ice-house? A. Yes.

"4. Is it not a fact that the plaintiff knew or might have known by the exercise of reasonable care the manner in which the scaffolding was constructed? A. No.

"5. If you answer the last question in the negative, say what there was to prevent the plaintiff, who was working around the scaffolding, from ascertaining with reasonable care the manner in which it had been constructed. A. The fact that it was not a part of his business, and in order to ascertain the exact standing of the scaffolding, it would have required extraordinary care and necessarily consumed a great deal of time in inspecting the whole scaffolding.

"6. Is it not a fact that the scaffolding was first constructed by nailing braces to upright posts, and then onto the main posts and some of the studding on the ice-house as it was in process of erection, and before the paper was put on? A. Yes.

"7. Is it not a fact that in order to nail the papering onto the studding it was necessary that the braces should be sawed off from where they were nailed onto the studding? A. Yes.

"8. Is it not a fact that it was also necessary that the braces should be sawed off in order that the sheeting might be put on? A. Yes.

"9. Is it not a fact that the plaintiff had worked on the other side of the building from where he received his injury in nailing paper onto the studding, and that the braces of the scaffolding had been sawed off next to the studding to the plaintiff's knowledge? A. Yes; it is a fact that plaintiff had worked on the north end of the building.

"10. Is it not a fact that from the above the plaintiff knew that in order to put the papering on the studding, the braces

on the scaffolding which fell had been sawed off before he went onto the scaffolding that fell? A. Yes.

"11. Is it not a fact that from what the plaintiff had done about the ice-house before the accident he knew that the braces would have to be sawed off to the studding in order to enable the men to put on the papering? A. Plaintiff knew the brackets or braces were cut off next to the studding, and supposed that they were properly stayed or propped.

"12. Is it not a fact that on the day prior to the accident, plaintiff and another man had been engaged upon the side of the house upon which the scaffolding in question was, in putting paper upon the side under the scaffolding, and up to the platform of the scaffolding? A. Yes.

"13. Is it not a fact that on the day prior to the injury, the plaintiff and another man had finished putting on the paper beneath the scaffolding and up to or nearly up to the platform of the scaffolding? A. Yes.

"14. Is it not a fact that the plaintiff and Mr. Crummet on the morning of the accident without any special directions from the boss or superintendent of the building, went up on the scaffolding for the purpose of continuing to put on the paper from a point where they had left off the day before, or evening before? A. Yes. On the morning of the accident, the plaintiff and Crummet mounted the scaffolding with paper to complete the general order of the previous day to paper that side of the building.

"15. Is it not a fact that after the braces of scaffolding were sawed off next to the studding, that the men employed about there were to put props of board or joist under enough of the braces to support them? A. No. Mr. Dixon was sent to put up the necessary props, but was called away by Mr. Kendall before completing the job, unbeknown to the plaintiff.

"16. Is it not a fact that the plaintiff knew, or ought to have known by the exercise of reasonable care, that after the braces had been sawed off the scaffolding would not be sufficient to support men unless props were placed under the braces? A. Yes.

"17. Did the plaintiff, prior to going on the scaffolding on the morning of the accident, pay any attention at all to see whether the scaffolding had been properly propped, or propped at all or not? A. Yes, in a general way.

"18. Could not the plaintiff by reasonable care have rea-

sonably ascertained whether the braces of the scaffolding had been propped or not; if not, what prevented him? A. No; plaintiff supposed from a general observation that they were all properly propped.

"19. On the day prior to the accident of the afternoon there while the plaintiff was engaged under the scaffolding that fell, in putting on the paper, could he not by exercising reasonable care, have ascertained the manner in which the scaffolding was propped? A. No; it would have required extra care.

"20. If you answer the last question in the negative, then state what there was to prevent the plaintiff from ascertaining if he had used reasonable care? A. It would have taken his mind and attention from the work he was ordered to do. Plaintiff was not ordered to inspect the scaffolding.

"21. Is it not a fact that plaintiff and Crummet were working upon the scaffolding about an hour prior to the accident, and continued thereon until the scaffolding fell? A. Yes.

"22. Is it not a fact that the plaintiff and Crummet were engaged in putting on the paper along the side of the building, and were about the middle of the second row along near the middle of the scaffold at the time it fell? A. Yes."

"24. Is it not a fact that the plaintiff knew prior to the accident that the scaffolding in question was somewhat weak, but thought it was sufficient to support the two men at work upon it? A. No.

"25. How many braces were there under the scaffolding on the side of the building on which the scaffold was, which fell? A. About sixteen."

The railroad company filed its motion for judgment and a new trial, which was overruled, the company excepting. Judgment was rendered upon the verdict of the jury for $2,900, and costs. The *Company* brings the case here.

*Geo. R. Peck, A. A. Hurd*, and *Robert Dunlap*, for plaintiff in error.

*W. R. Brown*, and *H. C. Johns*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action in the court below to recover damages for personal injuries received by James Sly,

while employed by the Atchison, Topeka & Santa Fé Railroad Company in papering an ice-house which was being erected at Nickerson. Sly was standing on a scaffold, which fell while he was at work; the scaffold was defective, in that the cross-pieces or braces which held and strengthened it had been sawed off so that the paper might be put on the house, and the cross-piece or brace where the accident happened was not made secure or safe by sufficient props. One Dixon, a carpenter, who was working upon the scaffold, testified —

"That he cut off some of the cross-pieces or braces, and several other workmen also cut off some; that he stood on trestles below to cut off the cross-pieces or braces; that before these were sawed off, there was a brace extending from the upright to the cross-pieces or beams to hold them; that when he went to fix the cross-piece or brace that fell, he got a piece two by six inches that was too short; that he put this under the end of the cross-piece or brace temporarily, until he could obtain a piece sufficient to hold it; that while he was hunting for a suitable piece to nail on, Kendall called him away."

Kendall, in constructing the ice-house, represented the railroad company. He was the boss or foreman of the work; he hired and discharged the employés; he kept their time and paid them. (*Railway Co. v. Little*, 19 Kas. 267; *Railroad Co. v. Fox*, 31 id. 586.) Sly was a carpenter by trade, but was putting on paper at the time the scaffold fell.

We think the court below committed errors in the trial of the case, but under the special findings of fact of the jury, which are supported by the evidence, the errors alleged are unimportant. It appears that Dixon was called away from the scaffold by Kendall, when it was in an insecure condition, and the falling of the scaffold and the injury to Sly resulted from the orders of Kendall, the superintendent or "boss" of the work. The errors alleged in the brief concern the admission of evidence; the refusal to give instructions based upon the opinions in this court of *Railroad v. Wagner*, 33 Kas. 660, and *Railroad v. Ledbetter*, 34 id. 326, and the giving of instructions which are alleged to have been too vague and general. The trial court permitted a physician to testify that the in-

juries Sly received would disable a laboring man from his ordinary pursuits all the way from one-half to total disability. We are inclined to doubt whether this testimony was competent without a further preliminary examination of the witness, but under the circumstances of the case the testimony was not harmful.

Sly was a witness before the jury, and testified in his own behalf. When the scaffold fell, his foot and ankle were hurt — the ankle being dislocated. The jury had full opportunity to observe how much his injuries would disable him in his work. A physician testified that the injuries were permanent; that the ankle-joint was suffering from partial anchylosis, and that there was general atrophy of the injured limb.

Dr. Smolt was the only witness introduced upon the part of the railroad company — he is one of the surgeons of the company. He obtained from Sly a history of the case at the time he was injured, but no questions were asked him concerning the injured foot or ankle, and nothing was offered conflicting with the evidence of Sly as to his injuries. Upon the trial, to affect the credit and show the interest of Dr. Smolt, who was a witness for the company, the court permitted upon his cross-examination questions of his efforts to compromise Sly's claim to be asked. This testimony was competent for the purpose for which it was introduced, but it was not competent as testimony imputing negligence to the company. Therefore, when the company requested the court upon such testimony to instruct the jury that they could not consider it as making the company liable, the instruction should have been given; but the findings of the jury fix the liability of the company upon the fault of Kendall, the superintendent, and not upon the acts or language of Dr. Smolt, and therefore the failure to give the instruction did not affect the jury, or prejudice the rights of the company.

In the *Wagner* and *Ledbetter* cases, the injuries attempted to be proved were caused by defects in the drawbars of certain cars; but the railroad company in those cases had no knowledge or notice of the defects prior to the accidents.

In this case the injuries did not result from a secret or an unknown defect, but from the failure to supply a sufficient prop to the scaffold, which was wholly caused by the orders of the superintendent of the work. The defect complained of was the result of the affirmative act of the company through its superintendent. Therefore, the instructions requested were not applicable.

While the instructions given were not as full as they ought to have been, and while their language may be criticised, the findings of the jury so clearly fix the liability of the company that the judgment cannot be reversed. (*Luke v. Johnnycake*, 9 Kas. 511; *Edwards v. Porter*, 28 id. 700; *Woodman v. Davis*, 32 id. 344; *Salt Works v. Wemyss*, 38 id. 482.) There is no complaint that the findings of fact are against the evidence, or that the instructions are erroneous — merely that they are too vague and general.

*Findings clearly fix the liability of company.*

The other errors alleged are too unimportant to require comment.

There being no substantial error in the record, the judgment of the district court will be affirmed.

All the Justices concurring.